[File No. 6738]

NEW YORK LIFE INSURANCE COMPANY, a Corporation, Appellant, v. MARGARET G. V. HANSEN, Respondent.

(2 NW(2d) 163)

Opinion filed December 15, 1941·

*George P. Homnes,* for appellant.

*Ivan V. Metzger,* for respondent.

BURR, Ch. J. In September, 1934, plaintiff issued a policy of life insurance to Verner R. Hansen, with the defendant, his wife, as beneficiary.

The contract contained this provision: "This policy may be reinstated at any time within five years after any default, upon presenta-

tion at the Home Office of evidence of insurability satisfactory to the Company and payment of overdue premiums with six per cent interest thereon from their due date. . . ."

The company determined what was to be "evidence of insurability."

The insured failed to pay the premium due in September, 1935, and the policy lapsed. On November 30, 1935, the insured applied in writing to the company for reinstatement of the policy, upon blanks furnished by plaintiff, and in the application stated, "for the purpose of inducing the Company to reinstate said Policy, I make the representations contained in my answers to the following questions:

"1. Are you now, to the best of your knowledge and belief, in the same condition of health as you were when this Policy was issued? (If not, give details.) Ans. Yes."

"2. Within the past two years have you had any illnesses, diseases or bodily injuries or have you consulted or been treated by any physician or physicians? (If so, give full details, including nature, date, and duration of each illness, disease or injury, the name of each physician, and the dates of and reasons for consultation or treatment. Ans. No."

Upon this application, the policy was reinstated on December 6, 1935.

The insured failed to pay the next premium due, and on May 23, 1936, he made a similar application to the company, answering similar questions the same way; and on May 25, 1936, the policy was again reinstated.

The insured died on July 26, 1937. He had gone with a group to one of the lakes, and in diving, sank after swimming a short distance. The death certificate was offered by the plaintiff in evidence and received. This shows drowning as the cause of death. The proofs of death were offered in evidence by the defendant and received, no objection being made. These proofs show death by drowning. The record is clear that it was an accidental death. On August 6, the proofs of death were sent to the company on forms prepared and furnished by the company.

In November, 1937, the plaintiff commenced this action to cancel the policy, alleging the answers to the questions in the application for reinstatement were knowingly false when made by the insured; that the insured, for sometime preceding the date of the application, had been

suffering from serious physical ailments and diseases, the exact nature of which is not known to the plaintiff; had in said period consulted physicians; and was treated for such ailments and diseases, and was in fact confined in a hospital while receiving such treatments; that the plaintiff was deceived by these representations, and reinstated the policy believing and relying thereon; and that "had said application disclosed the truth concerning the physical ailments . . . and the truth of his consultations with and treatment by physicians the plaintiff would not have reinstated said policy nor accepted said defaulted premium."

The complaint further alleges that immediately upon discovering the misrepresentations (on October 8, 1937), the plaintiff notified the beneficiary in writing that it rescinded the contract and tendered to defendant the premiums paid in connection with the reinstatements, together with interest.

The answer consists in the main of a general denial, with a counterclaim, wherein the defendant, as the beneficiary under the policy, seeks to recover the amount alleged to be due under the contract of insurance.

The plaintiff replied, admitting the defendant was the beneficiary of the policy, and restated the allegations of its complaint with reference to alleged misrepresentation and deception.

The case was tried to the court. Judgment was rendered for the defendant on her counterclaim, and plaintiff appeals, demanding a trial de novo.

At the trial, plaintiff moved "to strike out the counterclaim on the ground that it is not a proper counterclaim under the definitions of the Statute, § 7449." The trial court reserved a ruling on this motion. The record shows no formal ruling, but as the court found for the defendant, the trial court in fact overruled the motion, and this action of the court is alleged as error.

There was no error in this respect. When the counterclaim was served upon the plaintiff, it elected to reply thereto. No demurrer was interposed, no motion made at that time, and, therefore, the motion, when interposed, came too late.

Defendant contends there is no proof the insured gave the answers set forth in the form of application for reinstatement. Plaintiff's solicitor of insurance testified he asked the insured if he wanted to reinstate, and prepared the applications for him. The defendant testified

that the signature to each application was the signature of her husband. There is no proof insured did not know what he was signing. The presumption is he did, and, therefore, he knew he answered "Yes" to the first question and "No" to the second.

The answer to the first question is merely a matter of opinion by the insured, and a wrong answer thereto does not vitiate the agreement to reinstate, when made in good faith and in the absence of proof showing intentional misstatement. See Donahue v. Mutual L. Ins. Co. 37 ND 203, 218, 164 NW 50, 52.

The reinstatements by the company were based upon these applications. Plaintiff did not see fit to require a medical examination as a prerequisite.

These applications were the only evidence of insurability required by the company, and in the form the company prepared is this statement: "If the evidence of my insurability is satisfactory to the Company and it has received all sums the Policy requires to be paid for reinstatement, then, and not until then, said Policy shall be deemed reinstated."

The company "received all sums the Policy requires to be paid for reinstatement." The insured paid premiums subsequently, evidently on the theory that the policy had been reinstated, for the premiums were payable semiannually.

The burden of proving the statements false is upon the plaintiff. The only real issue in dispute is the effect of the answers to the second question.

There is nothing in the testimony which shows when the company learned of the visits to the Mayo Clinic made prior to the first reinstatement; and it was more than a year and a half after the first reinstatement that the insured drowned, and almost two years after this reinstatement before the action was commenced to cancel the policy.

The medical director of the New York Life Insurance Company testified that if the insured had answered "Yes" to this question, the policy would not have been reinstated until the Company "had received authorization from Mr. Hansen to consult with the Mayo Clinic and obtain full information regarding the reasons for attending that clinic with full details of the history given to the physicians connected with the clinic and the diagnosis made, and if Mr. Hansen had declined to permit the Company to get this information from the clinic the applica-

tions for reinstatement would have been declined."

The defendant testified that in May, 1935, her husband, the insured, went to Rochester, to the Mayo Clinic; that he may have been there again in August of that year; that the May visit was to see about his eyes, that he had some spells of dizziness; but she also testified that he made no complaints.

The employer of the insured testified the insured had been continuously employed by him from the spring of 1932 until the time of his death; that deceased was away on a trip one time for a short while, but excepting during that period, he took no time off whatever, nor did he lose any time during that period because of sickness—working until the day he died.

Dr. Shelden of the Mayo Clinic testified that in the latter part ·of May, 1935, the insured had been at the clinic for several days; and in August, 1935, returned to the clinic and remained there for four days under observation. During this visit he was in a hospital. The nature of the first visit was not disclosed, nor was it shown that insured was in a hospital at that time.

The record is silent as to the nature of the examination which the insured received; what trouble, if any, he had; and whether the two visits related to the same subject. Dr. Shelden declined to answer questions with reference thereto on the ground that the statutes of Minnesota—the state where his deposition was taken—prohibited him from testifying regarding confidential information received from the patient for the purpose of enabling the doctor to diagnose or treat the patient. This privilege was claimed by the physician on all· occasions where an attempt was made to ascertain the nature of the visits to the clinic, and what, if any, condition was discovered.

At the taking of the deposition of Dr. Shelden, the plaintiff made an offer of proof to show "that if the privilege asserted by the doctor be not sustained that he would testify" showing a very serious condition of the insured in 1935, setting it forth in the offer of proof. This offer was not made at the time of trial, nor any ruling thereon sought. An offer of proof must be presented to the court for a ruling and must show reasonable grounds for believing the witness will testify, and an outline of what testimony is expected so the materiality may be disclosed. See Krogh v. Great West Life Assur. Co. 55 ND 722, 728, 214 NW 897, 899; and see 26 RCL 1032.

If the statutory prohibition prevents the introduction of the evidence, the effect thereof should not be charged to the defendant.

It is claimed the answer to the second question in the application for reinstatement is false, in part, at least, in that the insured had consulted physicians "within the past two years," but there is no proof whatever tending to show the insured "had any illnesses, diseases or bodily injuries" during the two years immediately preceding his application for reinstatement. Neither is there proof that the answer to the first question is false.

In the light of the record, we must determine whether the plaintiff has sustained the burden of proof to show that it was deceived by the alleged falsity of the statement, or the misrepresentations increased the risk.

Just what is included in the terms "consulted" and "treated" with reference to visits to physicians is set forth in 29 Am Jur 463, Insurance, § 570, and reference to such terms is treated in Brown v. Inter-State Business Men's Acci. Asso. 57 ND 941, 949, 224 NW 894, 897.

Both applications for reinstatement were taken by one Peter McIntyre, who was plaintiff's solicitor of insurance residing in Williston, the home of the insured and his wife. Mr. McIntyre had been with the plaintiff company continuously from 1921 to the time of trial. He went to see the insured, and "asked him if he was going to reinstate and if he was in the same good health as he was when it was taken out." So far as the record is concerned, other than the statements made in the application, this was the only question McIntyre asked him.

Good faith is presumed, for a person is presumed to be innocent of wrongdoing. ND Comp. Laws 1913, § 7936, subd. 1.

McIntyre approached the insured apparently for the purpose of having him reinstate his policy. He was never even asked if he had propounded this second question to the insured. He was questioned as to whether he had asked the first question. No reference was made to the second question. He says he wrote out the application, handed it to him (the insured), and he signed it; that he had asked him that one question, "whether he was in the same good health," and that was the same procedure with reference to the other application.

But a statement may be false, and yet this falsity not be material. Section 6501, ND Comp. Laws 1913, provides: "No oral or written

misrepresentation made in the negotiation of a contract or policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching, unless such misrepresentation is made with actual intent to deceive, or unless the matter misrepresented increased the risk of loss."

This section is applicable to the contract of reinstatement. There are two provisions therein which make a representation material. The first is the "actual intent to deceive." There is nothing in the testimony anywhere which shows any actual intent to deceive. Other than the fact the insured signed the statement, there is nothing to show that he even knew that answer was there.

The evidence also is defective in this, that we do not know whether there was anything actually wrong with the insured at that time so that he would attach any importance to the fact that he went to the Mayo Clinic and was checked over twice. Just why the insured went to the clinic, or how serious he thought any situation was is not disclosed.

In Brown v. Inter-State Business Men's Acci. Asso. supra, a doctor had consulted physicians, somewhat casually, and omitted to make reference thereto, and we construed such failure in the light of this statute. There is no evidence showing actual intent to deceive.

The other feature is the evidence does not disclose this misrepresentation increased the risk.

Our statute lays down the rule (§ 6500) that "the materiality of a representation is determined by the same rule as the materiality of a concealment." Section 6480 provides that a neglect to communicate that which a party knows and ought to communicate is called a concealment. The materiality of a concealment "is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due in forming his estimate of the disadvantages of the proposed contract or in making his inquiries." ND Comp. Laws 1913, § 6484.

The fact the insured died from drowning and not from any disease does not eliminate the effect of materiality of concealment in the light of this section quoted. Nevertheless, there must be some proof adduced showing "the probable and reasonable influence of the facts" upon the insurance company. There is no showing of any disease, symptoms, or

other facts. The testimony does not intimate what the examination would have disclosed. For all we know, the company would have reinstated after an examination.

It is true the complaint specifies that the insured was in fact suffering from diseases and ailments at the time of reinstatement, and that if the plaintiff had known of these ailments and diseases, it would not have reinstated the policy.

As pointed out heretofore, there is nothing in the record to show the insured was suffering from ailments and diseases at the time he applied for reinstatement. The complaint does not specify what were these ailments and diseases. It alleges the plaintiff was informed and verily believed that the representations made were not true, but it expressly says, with reference to these ailments and diseases, "the exact nature of which is not known to the plaintiff." What record there is shows good health, for he worked continuously.

The insured owed the company the same good faith which he had a right to demand of the company (Brown v. Inter-State Business Men's Acci. Asso. supra), but the plaintiff must show in what way the misrepresentation or concealment would have affected it under the facts that would have been disclosed.

Whether the policy would or would not have been reinstated is not a matter to be settled by the mere statement of the plaintiff, after the death has occurred. Volunteer State L. Ins. Co. v. Richardson, 146 Tenn 589, 606, 244 SW 44, 49, 26 ALR 1270, 1278. That is a question to be determined by the court on the facts adduced.

It is not enough to show merely that had the insured answered "Yes" to the second question, the company would have made an investigation. Plaintiff must also show something in regard to the result of the investigation so that we may determine what would be the probable and reasonable influence of what it found out upon examination.

The record does not show that if insured had stated he had consulted physicians, the policy would not have been reinstated. At the very best, there would have been merely a delay on the part of the company, for, so far as the record here shows, no serious condition would have been disclosed.

Such matter is treated excellently in a case which arose in Ontario and found its way to the Privy Council of Great Britain, the Supreme

Court of the Empire. The Mutual Life Insurance Company of New York had issued a policy of life insurance, and upon the death of the insured, refused payment on the ground of material misrepresentation and concealment. The trial court held for the beneficiary; the Ontario Court of Appeals reversed his judgment; the Supreme Court of Canada reversed the Ontario Court of Appeals; and the Privy Council sustained the Supreme Court.

The insured had certified he had not consulted, been prescribed for, or been treated by, any physician during the five years preceding his application, whereas in fact he had been treated by a physician on several occasions during that period. The policy contained a provision with reference to such statements to the effect that in the absence of fraud they were to be deemed representations and not warranties. The Ontario Appellate Court held that the misrepresentations and concealment were proven, were material, and, therefore, avoided the policy. Ontario Metal Products Co. v. Mutual L. Ins. Co. 54 Ont L Rep 299. On appeal to the Supreme Court of Canada, that court reversed, holding, "A policy cannot be avoided for nondisclosure or misrepresentation because the insured fails to mention as an illness or disease a condition which a reasonable man might not consider such, especially if on the whole the Court concludes that the contract was entered into in good faith; and the burden of proof of nondisclosure sufficient to avoid, and of the untruth of the answers of the insured lies on the insurer." [1924] (Can) SCR 35, [1924] 1 DLR 127.

On the appeal to the Privy Council, that court went even farther than this in sustaining the trial court, the syllabus stating, "When statements made by an insured person upon his application for a policy of life insurance are not made the basis of the contract but are to be treated merely as representations, an inaccurate statement is material so as to vitiate the policy if the matters concealed or misrepresented, had they been truly disclosed, would have influenced a reasonable insurer to decline the risk, or to have stipulated for a higher premium; it is not sufficient that they would merely have caused delay in issuing the policy while further inquiries were being made." [1925] AC 344, 16 BRC 893.

An excellent annotation follows this latter decision and covers the

large field of the effect of failure to disclose the fact of consultation, or of illnesses.

It was almost two months after the proofs of death were furnished before the company decided to attempt cancelation.

The plaintiff received the premiums and retained them until three months after the proofs of death were furnished. There is nothing in the testimony showing when the plaintiff learned of the alleged partial falsity of the answer to question No. 2. There is nothing to indicate whether the soliciting agent knew of his own knowledge that Hansen had been at the Mayo Clinic twice that year before the first application was made. There is nothing to indicate that insured consulted any physician between the time of the making of the first and the making of the second application. It was incumbent on the plaintiff to show when it learned of the falsity of the statement, for it was paid and it accepted premiums on the policy from that time on, and the policy was kept alive by the payment of premiums for a period subsequent to the time of death. It was on October 8, more than two months after the insured died, before the plaintiff tendered to the defendant a check for the premiums, with interest, but she declined to accept it.

Upon the whole record, we are satisfied that the trial court's finding of liability on the part of the plaintiff is correct, and we so find. The judgment, therefore, is affirmed.

Morris and Nuessle, JJ., concur.

Christianson, J. (concurring specially). I concur in an affirmance of the judgment.

The life insurance policy involved in this action was issued pursuant to an application dated August 31st, 1934, obtained by one Peter McIntyre, plaintiff's agent at Williston, North Dakota. The policy lapsed for nonpayment of premium due September 21st, 1935, and under date of October 30th, 1935, the cashier of plaintiff's branch office at Grand Forks, in this state, wrote the insured that the policy had "lapsed for the nonpayment of premium. The Company urges you on receipt of this letter to apply for the reinstatement of the policy. Please complete the application for reinstatement printed on the back and have your signature duly witnessed. . . . Apparently the insured

took no action, and on November 30th, 1935, McIntyre, plaintiff's agent, who had solicited the application for the insurance policy, called on the insured and prepared and presented to him an application for reinstatement. Thereupon the application was signed by the insured, and it was thereafter transmitted to the plaintiff's branch office at Grand Forks, together with the required premium payment, and was approved on December 6th, 1935.

The insured again permitted the insurance to lapse for nonpayment of premium due March 21st, 1936, and under date of April 28th, 1936, the cashier of the branch office of the plaintiff at Grand Forks again notified the insured that the policy had lapsed for the nonpayment of premium, and urged him to apply for reinstatement in a letter identical in language with that sent under date of October 30th, 1935. Apparently the insured failed to take any action in the matter, and on May 23d, 1936, McIntyre, the agent of the plaintiff, again called on the insured and prepared and presented for his signature an application for reinstatement. This application, together with the required payment, was transmitted to the branch office at Grand Forks and was approved on May 25th, 1936.

Upon the trial of this action the agent McIntyre was called by the defendant for examination, under § 7870, Comp. Laws 1913, as an agent of the plaintiff. Upon such examination he testified as follows:

"Q. What's your name, please?

"A. Peter McIntyre.

"Q. Where do you live?

"A. At 7½ Main Street, Williston.

"Q. What business are you engaged in?

"A. I write life insurance.

"Q. For what Company?

"A. New York Life.

"Q. And did you have that position on November 30th, 1935?

"A. Yes, I have been continuously with them since 1921. .

"Q. I show you Exhibit "5-A," and ask you if that is your signature, Peter McIntyre, written there?

"A. It is.

"Q. This is the signature of Verner Ridder Hansen over here?

"A. It is.

"Q. And that Exhibit "A" was all prepared by you with the exception of the signature of Mr. Hansen?

"A. Yes, I usually make those out.

"Q. You made this one out?

"A. Yes.

"Q. Did you talk to Hansen and ask him to reinstate?

"A. I am not so sure about that.

"Q. You went to see him?

"A. Yes.

"Q. What did you say to him and what did he say?

"A. I asked him if he was going to reinstate and if he was in the same good health as he was when it was taken out. He said, 'yes.'

"Q. You wrote it out and handed it to him and he signed it?

"A. Yes.

"Q. But you asked him that one question—whether he was in the same good health?

"A. Yes.

"Q. Applying to Exhibit "5-B," too?

"A. Well, as far as I remember.

"Q. You wrote this one, too? That is, Exhibit "5-B?"

"A. Yes.

"Q. As far as you remember now, you asked him if he was in the same good health, and he signed it?

"A. As close as I can get at it."

This constitutes all the testimony of this witness. (Exhibit "5-A" is the application for reinstatement dated November 30th, 1935, and Exhibit "5-B" is the application for reinstatement dated May 23d, 1936.)

Subsequent to the second reinstatement the required premiums were paid and the policy kept in force.

On July 26th, 1937, the insured died from drowning while swimming with some friends in a lake near Williston. On August 6th, 1937, proofs of death were submitted, and under date of October 8th, 1937, plaintiff rejected the claim and advised the defendant that it had rescinded both reinstatements of the policy.

The trial court filed a memorandum decision wherein it was held:

(1) "The plaintiff has failed to prove, by a fair preponderance of the evidence, that false representations or misrepresentations are contained in the answers" to any of the questions in the applications for reinstatement;

(2) If plaintiff has proven by a fair preponderance of the evidence that the answer to the question number 2 in each of the applications ("Within the past two years have you had any illnesses, diseases or bodily injuries or have you consulted or been treated by any physician or physicians?") was false, then such answer was inserted in each of the applications by the plaintiff's agent, McIntyre, at the time such applications were made out by him "notwithstanding the fact that the insured, Hansen, gave correct answers to the oral questions put to him by said agent; and that said McIntyre acted as plaintiff's agent, the insurer, and not as agent for Hansen, the insured; and that, upon such findings of fact, the court concludes that the plaintiff, as insurer, cannot take advantage of the false answer inserted by its agent, contrary to the facts as stated by the applicant, Hansen." That "the plaintiff's agent, Peter McIntyre, wrote the answer 'no' without first reading the question to Mr. Hansen. Plaintiff's agent merely asked the insured if he was going to reinstate and if he was in the same good health as he was when the policy was taken out. The insured answered 'yes,' and then the agent, McIntyre, filled in the blanks with his own handwriting and handed the application to the insured, Mr. Hansen, who then signed it." That "at the time that the insured, Hansen, signed the applications for reinstatement, and delivered them to agent, McIntyre, he was not even aware of the existence or substance of question number 2, and the negative answer thereto written in by agent, McIntyre."

The court made and filed formal findings of fact in accordance with the memorandum decision, and ordered that plaintiff's action be dismissed, and that defendant have judgment for the amount due on the policy.

In my opinion the findings and conclusions of the trial court are fully sustained by the record on this appeal. Plaintiff's cause of action is predicated upon certain misrepresentations alleged to have been made in the applications for reinstatement. The evidence shows beyond all doubt that these applications were solicited by the plaintiff, and that all answers to questions therein were written by plaintiff's agent. In

soliciting such applications for reinstatement and in writing the applications and presenting the same to the insured, McIntyre acted as the agent of the plaintiff, insurance company. Comp. Laws 1913, § 6632; Lechler v. Montana L. Ins. Co. 48 ND 644, 186 NW 271; 2 Couch, Insurance, pp. 1309, 1528; 29 Am Jur p. 112, Insurance; Continental L. Ins. Co. v. Chamberlin, 132 US 304, 33 L ed 341, 10 S Ct 87. In whatever he did in relation to the applications for reinstatement, McIntyre was the agent of the plaintiff "to all intents and purposes." In what he did he "was merely the arm" of the insurance company. Bekken v. Equitable Life Assur. Soc. 70 ND 122, 146, 293 NW 200, 214. In writing the applications, McIntyre did "what the company sent him out to do." He solicited the applications for the company, he asked questions, or refrained from asking questions, as the case might be, for the company, he wrote down answers and filled in the blanks in the applications for the company, and transmitted the applications for the company. Ibid. Any mistakes or representations made by the agent, McIntyre, in filling out the applications were not the mistakes or representations of the insured, Hansen, but the mistakes and representations of the insurance company. Continental L. Ins. Co. v. Chamberlin, supra; French v. State Farmers' Mut. Hail Ins. Co. 29 ND 426, 151 NW 7, LRA1915D, 766; 4 Couch, Insurance, pp. 2735 et seq.; 37 CJ 533.

McIntyre had been plaintiff's agent at Williston since 1921. The insured was a resident of Williston. In 1934 McIntyre solicited the application for the policy. In 1935 he went to see the insured and solicited the application for reinstatement, and in 1936 he again went to see him and solicited another application for reinstatement. The applications were written out by McIntyre. The insured was a laborer. It does not appear whether he had any other insurance, or whether he had ever applied for any. So far as the policy in question here is concerned, his dealings were all with McIntyre. It was only natural that the insured should rely upon McIntyre, and that he should sign such papers as McIntyre might prepare and present to bring about a reinstatement of the policy. 4 Couch, Insurance, p. 2738.

McIntyre continued to act as plaintiff's agent and was such agent at

the time of the trial of this action in November, 1939. Naturally he would not be an unfriendly witness to the plaintiff, and there is no claim that he was. McIntyre was the only person who knew what took place when the applications for reinstatement were signed. He was present at the trial, but the plaintiff did not choose to call him as a witness. After plaintiff had rested, and while the defendant was presenting her proofs, McIntyre was called by the defendant as a witness, under the provisions of § 7870, Comp. Laws 1913, which provides for the examination, "as if under cross-examination" of an adverse party in a civil action or proceeding, and when the adverse party is a corporation, or an officer or managing agent of such corporation. The testimony given by McIntyre upon such examination is set forth in full above. It speaks for itself. According thereto, McIntyre went to see the insured about the insurance poilcy. He asked the insured "if he was going to reinstate and if he was in the same good health as he was when it was taken out." There is not even a suggestion or intimation that any other or further question was asked. Upon receiving an affirmative answer to his question, McIntyre wrote out the application for "reinstatement and handed it to the insured, and he signed it." This, according to McIntyre's testimony, is what occurred. The plaintiff did not deem it to be to its interest to call McIntyre to amplify or explain anything he had said. It must be presumed there was nothing he could say, either in addition to or in explanation of the testimony he had given, that would be favorable to the plaintiff. 22 CJ pp. 115 et seq.; 1 Jones, Commentaries on Evidence, 2d ed. p. 156; 9 Enc. of Evidence, pp. 965 et seq.; 20 Am Jur p. 192, Evidence.

Omission to call or interrogate an available witness, especially if the witness possesses peculiar knowledge, and would naturally be friendly to the party's contention, "raises a strong presumption that the testimony, if elicited, would be unfavorable" to the party who fails to call or interrogate such witness. 22 CJ pp. 115 et seq.; 1 Jones, Commentaries on Evidence, 2d ed. p. 156; 9 Enc. of Evidence, pp. 965 et seq.; 20 Am Jur p. 192, Evidence:

"The scope of the rule is illustrated by the fact that it applies even to failure to combat adverse inferences. Where evidence has been

introduced affording legitimate inferences going to establish the ultimate fact that the evidence is designed to prove, and the party to be affected by the proof, with an opportunity to do so, fails to deny or explain such facts, they may well be taken as admitted with all the effect afforded by the inferences." 1 Jones, Commentaries on Evidence, 2d ed. pp. 156, 157.

The findings of the trial court as to what occurred at the times the two applications for reinstatement were signed by the insured, and the conclusion drawn by the trial court that the answers to question number 2 in each of the applications for reinstatement were not made by the insured but were in fact made by plaintiff's agent, are in accord with the testimony of McIntyre.

Inasmuch as the alleged false statements in the applications for reinstatement were made by plaintiff's agent, and not by the insured, it is unnecessary to consider what the consequences would have been if the statements had been made by the insured. But even if the statements were made by the insured (as the majority opinion assumes), the judgment should be affirmed. The plaintiff had the burden of proof. 9 CJ p: 1252; 9 Am Jur p. 400, Cancelation of Instruments; 32 CJ p. 1269. It required clear and convincing evidence to sustain such burden.

For "to justify the cancellation of insurance contracts for fraud and mistake in a court of equity, the evidence thereof must be so clear, cogent, and convincing as to leave no room for reasonable doubt in the conscience of the court." 32 CJ p. 1269.

It was incumbent upon the plaintiff to prove not only that the alleged representations were made, and that they were false, but that the insured made the representations "with actual intent to deceive," or that "the matter misrepresented increased the risk of loss." Comp. Laws 1913, § 6501.

The plaintiff chose to avail itself of the provisions of the laws of this state, which permit the testimony of a witness to be taken, and presented upon the trial, by deposition. The insured died on July 26th, 1937. The plaintiff rejected defendant's claim for loss on October 8th, 1937, on the very grounds which form the basis for this action to cancel the policy. This action was instituted in November, 1937. The

deposition of Dr. Shelden (referred to in both the majority and in the dissenting opinion) was taken at Rochester, Minnesota, on April 15th, 1938. This action was tried on November 27th, 1939,—more than nineteen months after the deposition had been taken. The deposition was not taken under a commission, upon written interrogatories. Comp. Laws 1913, § 7894. It was taken under statutory provisions, authorizing a deposition to be taken pursuant to notice to the adverse party without the use of written interrogatories. Comp. Laws 1913, § 7895. At the taking of the deposition defendant made no appearance either in person or by counsel. Consequently, the examination was in no manner impeded by objections on the part of the defendant to any questions asked, or proceedings had.

No exceptions were filed to the deposition (Comp. Laws 1913, § 7906), and it was received in evidence in its entirety. In fact, all evidence offered by the plaintiff upon the trial was received.

Dr. Shelden testified that he was connected with the Mayo Clinic as a Junior Surgeon; that he had been connected with the Clinic since 1933, and that in 1935 he was First Assistant in Neurological Surgery, but that he was not licensed to practice medicine and surgery in Minnesota until 1936, and that he had not been licensed to practice in any other State prior to that time. He testified that he saw the insured daily from August 26th to August 30th, 1935. He further testified that his testimony to that effect was obtained from the records of the Clinic and that he had no independent recollection of seeing the insured on any particular dates. He also testified that the insured had a general examination in the Clinic in 1935 and that during his stay from August 26th to August 30th, 1935, he had an examination in the Department of Neurology but that he (Dr. Shelden) did not conduct the examination. When asked, "Did you see him prior to August 26, 1935, and in the year 1935?" Dr. Shelden answered: "Not as far as I can determine from the records."

Reference is made in both the majority and in the dissenting opinion to the testimony of Dr. Shelden, and his refusal to answer certain questions.

Dr. Shelden declined to answer two questions on the ground that they called for information received by him as a physician, and that

consequently he was prohibited by the laws of Minnesota from disclosing the same. The first question inquired as to his diagnosis of the condition which the insured complained about when he came to the Clinic in June and August, 1935; and the second question inquired as to whether the condition in which the insured was found to be upon these examinations was a serious condition as opposed to one of trivial or passing character. Immediately preceding these questions Dr. Shelden testified as follows:

"Q. From the records that you have before you are you able to say whether the visit to the Clinic in August, 1935 was for the same sickness, ailment or bodily injury as occasioned the visit of June 4th,—or May 31, 1935?

"A. As to that I don't believe I could answer. I don't recall.

"Q. From the records can you tell?

"A. I can't tell from the records exactly what occasioned him to consult us on the two different occasions.

"Q. Will you say, Doctor, that the occasion for the visit in August, '35 was not for the same bodily condition or complaint that the patient came to see you for or about in June of 1935?

"A. I don't believe I could answer that question. I have a record only of the findings. I haven't any record of his psychic or mental condition. I do not know exactly what he consulted us for on the two different occasions.

"Q. Well, you have your history before you there.

"A. Yes, I have the history that he gave us but I can't answer your questions with regard to what reasons he had for coming.

"Q. Well, is there a connection between the ailment or condition for which he consulted you in June, 1935 and the ailment or condition for which he consulted you in August, 1935?

"A. I would say that his symptoms might suggest that there was some continuation in August of the symptoms which were present prior to that time.

"Q. Isn't it a fact, Doctor, that it was for the same condition?

"A. I can say that a similar diagnosis was made on the two occasions."

It will be noted that Dr. Shelden had nothing to do with the insured,

and did not see him at all, the time he came to the Clinic in June, nor did he make an examination of the insured at any time. Whether he made a diagnosis in August or whether the diagnosis was made by someone else, and what the diagnosis was, are matters which the testimony does not disclose. The plaintiff did not see fit to call any other person connected with the Clinic or to produce any other testimony having any relation to the condition of the insured at that time, with the single exception that the plaintiff called the defendant for examination as an adverse party. In response to leading questions she testified that her husband went to the Mayo Clinic at Rochester the last of May or the first of June "to see about his eyes"—"one eye," and that before that time he had had some spells of dizziness. She testified that in August he went to Minneapolis to see his aunt and uncle and that she did not know whether he went to Rochester at that time. She stated that her husband had not complained about any other ailment or affliction. The employer of the insured testified that the insured was employed by him from the spring of 1932 until the time that he died; that during all that period he did not lose any time on account of sickness; that he worked continuously with the single exception of a short time that he was away on a trip. Two men who worked with the insured in the bakery also testified. Their testimony,—which is undisputed,—shows that on the day that the insured died he worked in the bakery until about 5 o'clock in the afternon when he and the two coemployees went to a lake or pond some three miles from town to swim.

The insured dived into the pond from a springboard. The two men who came with him had already entered the pond. They saw him dive and later saw him swimming. They were not aware of any trouble until a woman told them that she had seen "the man who came with them go down." The evidence does not show how long time elapsed before the body of the insured was found and removed from the pond; but it does show that efforts were made to resuscitate. The certificate of death, which was offered in evidence by the plaintiff, states that the cause of death was drowning; and no contributory cause of death is stated in the space provided in the certificate for listing such causes. The evidence adduced by the plaintiff as to the state of health of the insured at the time he was examined at the Mayo Clinic in 1935, the

reasons for his going to the Clinic, and the state of his health subsequent thereto, sums to this:— The insured went to the Mayo Clinic in the latter part of May or the early part of June 1935, to see about his eyes, or one eye; before going to the Clinic he had had some "spells of dizziness;" how long he had been subject to these spells, their frequency, duration and the circumstances under which they might arise, is not disclosed. Whether the insured had any refractory defect such as near-sightedness or astigmatism, the evidence does not show. In August, 1935, the insured again went to the Clinic. Since 1932 up to the time he went down in May or June he worked at his trade continuously. After he came back from his first trip to the Clinic he again went to work and worked at his trade. After he came back in August, 1935, he worked at his trade continuously up to, and including, the day that he died from drowning. Williston is a city having a population of less than 5,800. The insured had lived and worked there continuously since 1932. Not a single witness was produced to show that there was anything to indicate that the insured was not in perfect health. The spells of dizziness and the fact that he deemed it necessary to go to a clinic about his eyes does not evidence the existence of any serious or chronic ailment tending to increase the risk of loss under a life insurance policy. According to recognized medical authorities, spells of dizziness may result from eye strain, near-sightedness or astigmatism. One of the recognized authorities in ophthalmology says that sensations, "varying from a sense of insecurity and bewilderment to nausea and dizziness, or even actual vomiting and falling . . . may result from *blurring* and *distortion* due to refractive errors, especially astigmatism;" that "like feelings may result from *misjudgment of position or distance*" and follow "in some degree, upon every change of lenses." The Eye and Its Diseases, by Dr. Berens, pp. 147, 148.

There is deficiency in plaintiff's proof in another respect. The first application for reinstatement was dated November 30th, 1935, and approved December 6th, 1935, and the second application for reinstatement was dated May 23d, 1936, and approved May 25th, 1936. The communication from the plaintiff notifying the defendant that plaintiff had elected to rescind the reinstatements was dated October 8th, 1937. More than sixteen months intervened between the approval

of the second application for reinstatement and the declared intention of the plaintiff to rescind. The right to rescind a contract on the ground of fraud must be exercised by the party possessing the right "promptly upon discovering the facts which entitle him to rescind, if he is free from duress, menace, undue influence or disability and is aware of his right to rescind." Comp. Laws 1913, § 5936; 2 Black, Rescission and Cancellation, 2d ed. pp. 1316 et seq. And where an action to rescind and cancel a contract on the ground of fraud is brought a considerable time after the alleged fraudulent representations were made, the plaintiff is required to show that the suit was brought within a reasonable time after the discovery of the fraud. 12 CJS p. 1045; 9 CJ p. 1244, § 175; 18 Enc Pl & Pr pp. 825 et seq. The plaintiff recognized that in this case it was incumbent upon it to plead and prove that it acted promptly on the discovery of the alleged fraud. In its complaint the plaintiff alleged "that immediately upon the discovery of said misrepresentations in said applications, to wit: on the 8th day of October, 1937, the plaintiff notified said defendant in writing that it elected to rescind and cancel and did thereby rescind and cancel said reinstatements of said policy." But the allegation was not proven. Plaintiff failed to introduce any evidence whatever tending to establish it. So far as the evidence in this case shows, the plaintiff discovered and had full knowledge of every fact, which it claims entitles it to rescind the reinstatements and to have the same cancelled, shortly after, or even before, the reinstatements were approved.

The plaintiff invoked the equitable jurisdiction of the court to cancel the insurance policy. The defendant joined issue, and asked that plaintiff be denied the relief it seeks in the action; that the policy be not cancelled, and that she have judgment for the amount due on the policy. The plaintiff having failed to show that the policy should be cancelled, it continued in full force, and the defendant was entitled to judgment as demanded in her pleading—for the death of the insured, and the presentation of due proof of such death were established by undisputed proof. The plaintiff having brought the defendant into equity by suit to cancel the policy, and having failed to establish facts entitling it to cancelation, cannot be heard to question the jurisdiction of the court to render judgment for the amount due on the policy. Zollman

v. Jackson Trust & Sav. Bank, 238 Ill 290, 87 NE 297, 32 LRA(NS) 858; 9 Am Jur p. 399, Cancelation of Instruments; 21 CJ pp. 137 et seq.; CJS p. 1097.

"Equity having once acquired jurisdiction and having before it the proper parties and the subject matter to enable it to do complete justice between them, will not relegate the defendant to the necessity of relitigating his rights at law." 9 Am Jur p. 399, Cancelation of Instruments. See also Zollman v. Jackson Trust & Sav. Bank, supra; French v. State Farmers' Mut. Hail Ins. Co. 29 ND 426, 438, 151 NW 7, 10; 1 Pomeroy, Eq. Jur. §§ 231-242.

Burke, J. (dissenting): I dissent. I agree with the principles of law stated in the majority opinion but I do not agree that the proofs presented by the plaintiff and the justifiable inferences to be drawn therefrom do not establish a case in its behalf.

This case is here for a trial anew upon the whole record. We are sitting as judges of the facts as well as judges of the law. And in judging the facts, I do not take it that it is our function to strip them of their natural import and to demand that the normal and reasonable implications thereof be established by independent proofs of mathematical exactitude. In fact I know of no reason why we as judges may not weigh facts in the scales of our own experience or why the permissible measure of persuasion available to juries is not also available to judges.

As stated in the majority opinion, it was plaintiff's burden to establish both the fact of misrepresentation and that the misrepresentation increased the risk of loss upon the reinstated policy. The fact of misrepresentation is conceded although it is contended, and the trial court found, that the misrepresentation was that of the insurer's agent and not that of the insured. With this finding I disagree. Answers to two questions were required in the application for reinstatement. The insurer's agent testified that he entered upon the blank form the answers to both questions. He also testified that before entering the answers, he asked the insured question number one. He was then asked if he asked the insured that one question and he answered, "yes." As to whether he asked the second question or not the record is silent. Assuming that it is established by this record that the insurer's agent did not ask the insured the second question, does that fact by itself over-

come the presumption that the signer of a written instrument is aware of its contents and that the insured knew when he signed the application what answers had been set down therein? I think not. If there were evidence that the insured was illiterate, that he was hurried or for some other reason had no opportunity to know the contents of the application, a different situation would be presented. In my judgment he knew what he signed and the misrepresentation, if any, was his, even though he may have been abetted by the insurer's agent.

The representation, made in answer to the second question upon the application, was that the insured had not within the past two years had any illnesses, diseases or bodily injuries or had not consulted or been treated by any physician or physicians. The application was signed on November 30th, 1935. In May and August, 1935, the insured had consulted, in their professional capacity physicians of the Mayo Clinic at Rochester, Minnesota. There is no question as to the falsity of the representation. Did this misrepresentation increase the risk of loss upon the reinstated policy? I restate the question. Did the misrepresentation result in concealing from the insurer some bodily ailment or disease from which the insured suffered and which made the insured a poorer insurance risk than the information disclosed to the insurer indicated? The record discloses that in May 1935, the insured was suffering from dizziness, and fainting spells and from an affection of one eye. He considered his condition sufficiently serious to justify a round trip of some 1,500 miles to consult with the physicians at the Mayo Clinic with respect to his physical condition. He arrived in Rochester in the latter part of May. He registered at the clinic on May 31st and was discharged on June 4th. Again in August he visited the Mayo Clinic and upon this occasion spent four days in St. Mary's Hospital. Dr. Shelden of the Clinic testified that the symptoms exhibited by the insured in May were the same as those exhibited in August, and that the same diagnosis was made on both occasions. He declined to answer questions as to the diagnosis that was made or as to the nature of the symptoms upon the ground that the information was privileged under the Minnesota Statutes. We know from other sources what the symptoms were. We know that in May and the early part of June they were dizziness, fainting spells and an affection of one

eye. We know that those same symptoms contined through August or recurred in August. In his testimony Dr. Shelden used the word continuation. To my mind the proven facts demonstrate that the insured was suffering from some ailment which was both serious and chronic in its nature. This is the reasonable inference from the facts in the light of probabilities. And when fortified by the failure of the defendant to disclose the nature of the insured's ailment, the inference is inescapable.

I think that the judgment of the district court should be reversed and judgment ordered for the plaintiff.