352 F.2d 592
 MILBANK MUTUAL INSURANCE COMPANY, a Foreign Corporation, Appellant,
v.
Dale WENTZ, Leo Gefroh, as Surviving Husband of Barbara
Gefroh, Deceased, Individually and on behalf of Leo Gefroh,
a Surviving Child, Josephine M. Knutson, General Guardian of
the Person and Estate of Kenneth Ray Carles and David Allen
Carles, Minors. Eugene Gefroh and Barbara Gefroh as
Administratrix of the Estate of Bernhard Gefroh, Deceased, Appellees.
 No. 17982.
 United States Court of Appeals Eighth Circuit.
 Nov. 10, 1965.
 
 Mart R. Vogel, Fargo, N.D., made argument for the appellant and filed brief.
 F. J. Smith, of Fleck, Smith, Mather, Strutz & Mayer, Bismarck, N.D., and E. F. Engebretson, of Cox, Pearce, Engebretson, Murray & Anderson, Bismarck, N.D., made argument for the appellees.
 F. J. Smith, Bismarck, N.D., filed brief for appellee Dale Wentz.
 E. F. Engebretson, Bismarck, N.D., filed brief for appellees Leo Gefroh, and others.
 David L. Milhollan, of Wolf, Glaser & Mihollan, Bismarck, N.D., filed brief for appellees Eugene Gefroh and others.
 Before MATTHES, RIDGE and GIBSON, Circuit Judges.
 GIBSON, Circuit Judge.
 
 
 1
 This appeal is from the United States District Court for the District of North Dakota, holding appellant liable as an insurer under an automobile liability policy. Appellant is a South Dakota insurance corporation, and appellees were the litigants in a state court action which arose out of an automobile collision. Diversity of citizenship, with requisite amount, establishes jurisdiction. The substantive law of North Dakota applies.
 
 
 2
 On July 21, 1959, Eugene Gefroh was driving a 1957 Ford automobile eastward along North Dakota U.S. Highway 10. With Eugene were his older brother Leo and Leo's wife Barbara. It was nearly dark and the blacktop road was wet from a recent rain. Travelling at about 60 miles per hour, Eugene overtook a large truck on an upward grade. He pulled into the left lane to pass the truck and struck head-on a car driven by Dale Wentz. Leo's wife, Barbara was killed and Leo was severely injured. Also injured severely in the crash was the driver of the other car, Dale Wentz.
 
 
 3
 This 1957 Ford driven by Eugene was purchased a year earlier by his father Bernhard Gefroh and the certificate of title was in Bernhard's name. Between Eugene and his father Bernhard, however, there was an oral agreement that Eugene could use the car and gradually repay his father the purchase price. At the time of the accident all but about $300 of the $1,900 purchase price had been repaid.
 
 
 4
 Immediately after Bernhard purchased this car, he secured in his own name a liability insurance policy from appellant Milbank Mutual Insurance Corporation (hereafter referred to as Milbank or Appellant). The policy had a maximum coverage of $20,000 for multiple claims. The application for insurance indicated that Bernhard (called 'Ben' therein) was the owner and that his son Eugene would operate the car approximately 25 per cent of the time. Since the original application the policy had been renewed without change twice and was in force at the time of the above-described collision. It does not appear to what extent the car was actually used by young Eugene at the time of the initial application for the insurance. However, at the time of the accident he was working in a neighboring town, and it is clear that he was driving the car about 90 per cent of the time.
 
 
 5
 Upon receiving notice of the accident, Milbank undertook an investigation of the collision. On July 27, 1959, some six days after the collision, Milbank filed with the North Dakota State Highway Department a form SR-21 confirming that the Gefroh vehicle was covered by liability insurance issued by it.
 
 
 6
 In June 1960 Bernhard Gefroh, the record owner of the car, died, and his wife was appointed administratrix of his estate.
 
 
 7
 Approximately a year following the accident, August 12, 1960, suit was filed in a state court against Eugene Gefroh, driver of the Ford, the estate of Bernhard Gefroh, as owner, and Dale Wentz, the driver of there other car. Plaintiffs in this suit were Leo Gefroh, a passenger in the car driven by his brother Eugene, for himself, on behalf of his wife Barbara who was killed in the collision, and their minor child; and Josephine Knutson, the guardian of two minor children of a prior marriage of Barbara Gefroh, deceased. Being a defendant in the suit, the driver of the other car, Dale Wentz filed a cross-claim against his fellow defendants. The total prayer for damages against Eugene Gefroh and the estate of Bernhard Gefroh was more than $340,000, thus greatly exceeding the policy coverage of $20,000.00.
 
 
 8
 Milbank assumed the defense of the suit and began its preparations. On December 22, 1960, a year and a half after the collision, Milbank notified Eugene and the administratrix of Bernhard's estate that it appeared to them that Eugene and not Bernhard was the owner of the auto at the time of the accident. Because of this, the letter continued, Milbank by undertaking the defense of the matter was not waiving any of its rights to deny coverage. On receiving this 'reservation of rights' notice, Eugene and the estate of Bernhard, in order to protect their interests, retained counsel who associated himself with the defense of the case. Milbank, however, continued with the preparations and made no further move to deny coverage or revoke the policy.
 
 
 9
 On May 23, 1961, the attorneys representing plaintiff Leo Gefroh and cross-claimant Dale Wentz offered to settle all claims for a total of $20,000, the insurance policy limits.
 
 
 10
 On May 29, 1961, the independent attorney for defendants Eugene Gefroh and the estate of Bernhard Gefroh addressed a letter to the attorneys for Milbank. Copies were sent to the attorneys for plaintiff Leo Gefroh and cross-claimant Dale Wentz. The letter stated that 'there is practically no possibility of successfully defending these claims. * * * It is quite possible that verdicts in excess of $100,000 would be returned by a jury.' The letter continued that in view of the offer to settle $340,000 in claims for the policy limits of $20,000 it would be mutually beneficial to both the insurer and insured if the offer were accepted. The attorney pointed out that a refusal to accept the offer would subject his clients to a risk of tremendous liability; and further, demanded that 'full control over the defense of this matter' be turned over to him, if Milbank elected not to accept the settlement offer.
 
 
 11
 Milbank did not accept the offer and a week later, only two days before the scheduled trial, it withdrew from the case. The other parties received notice of this withdrawal only a day before the scheduled trial.
 
 
 12
 Thereafter, on June 6, 1961, the appellees herein stipulated for an entry of judgment in favor of plaintiff and cross-claimant against Eugene and the estate of Bernhard. After hearing testimony, the Court entered judgment as stipulated for a total of $21,925, of which $10,000 was to be paid to plaintiff and $11,925 to cross-claimant.
 
 
 13
 Appellees then filed in the state court an action for declaratory judgment against Milbank seeking a declaration of its liability under the policy. The action was removed to the United States District Court for the District of North Dakota. The issues were submitted to the trial court on stipulated facts, including depositions and exhibits.
 
 These four issues were presented:
 
 14
 1. At the time of the original application of insurance, was there a misrepresentation of the ownership of the Ford?
 
 
 15
 2. Was there a change in the ownership prior to the accident?
 
 
 16
 3. Was the co-operation clause of the policy violated by the admission of liability and assumption of the obligation of the defense contained in the letter of May 29?
 
 
 17
 4. Do the policy provisions demanding that insured's liability be established 'after actual trial' relieve Milbank of the obligation to respond to the state court judgment?
 
 
 18
 Resolving all issues in favor of the appellees the trial court answered all four of these questions in the negative and ordered Milbank to pay the amount set forth in the policy. From this judgment Milbank appeals.
 
 
 19
 Milbank contends that the negative conclusion of each of these issues was erroneous.
 
 
 20
 We shall deal with the issues in the order of their consideration by the trial court. The first point of asserted misrepresentation of ownership at the time the policy was originally purchased is of no merit. Bernhard Gefroh, the father, purchased the vehicle for his twenty-one year old son Eugene, paying therefor the entire consideration of some $1900 and had title registered in his name. There is no indication that Bernhard did not immediately assume the ultimate right of control over the vehicle. The insurance application lists the insured, Bernhard Gefroh as the sole owner and also shows in item 6(c) that he has 'other automobile/truck insurance' with Milbank under two additional policies; and in addition shows 'Eugene Gefroh, son, age 21' as one of the drivers of the insured vehicle and that he would be driving it 25 per cent of the time.
 
 
 21
 Milbank relies on the case of Didlake v. Standard Insurance Co., 195 F.2d 247, 33 A.L.R.2d 941 (10 Cir. 1952) as authority for the view that Eugene and not Bernhard was the actual owner. The facts of Didlake are clearly distinguishable. In Didlake the record owner was merely a 'front man' to enable the real owner, a 17-year old minor, to secure the necessary financing and insurance for the vehicle. The minor was not even listed on the insurance policy as a driver. The record owner had no financial or possessory interest in the automobile, nor any intention of using it.
 
 
 22
 There is no evidence that Eugene at the time of the car's initial purchase had any legally recognized interest in the car or any right to its control. The trial court correctly ruled that there was no misrepresentation of ownership at the time of the application for insurance.
 
 
 23
 Milbank also points to the fact, although the insured represented that Eugene would be driving the car approximately 25 per cent of the time, he was driving nearly 90 per cent at the time of the accident. We do not believe the circumstances warrant a finding that this representation made more than a year before the accident in question amounted to a fraudulent misstatement. There is no indication that the statement was not true at the time it was made. Even more important, this representation of driving time can only be an estimate of future activity and is not a representation of an existing fact. It is a factor that is subject to change depending upon the personal situation and many other factors that affect the day-to-day living requirements of an individual. Obviously anyone insured with three insurance policies would be having other people driving his cars or trucks a considerable part of the time, and he should not be called upon at his peril to make a correct estimate of the future driving of each.
 
 
 24
 The second issue raised by Milbank that there was a change in ownership of the automobile after the policy was issued, because of Eugene making periodic payments to his father with the ultimate intention of purchasing the automobile, is not well taken. Milbank refers to North Dakota, C.C. 39-01-01, paragraph 22 which reads as follows:
 
 
 25
 '22. 'Owner' shall mean a person who holds the legal title of a vehicle, or if the vehicle is the subject of an agreement for the conditional sale or lease thereof with the right of purchase upon performance of the conditions stated in the agreement, and with an immediate right of possession vested in the conditional vendee or lessee, or if a mortgagor of a vehicle is entitled to possession, then such conditional vendee or lessee or mortgagor shall be deemed the owner for the purposes of the title.';
 
 
 26
 and further notes that 51-01-04 of the same Code provides that a sale of a motor vehicle may be an oral transaction.
 
 
 27
 Milbank contends by reason of the above statute that the agreement to make periodic payments with the intention of ultimately obtaining record title makes Eugene analogous to a conditional vendee, and as defined by the statute, the owner of the vehicle. This change in ownership, it contends was a fact materially changing the risk, and since it was not noted in the policy, the policy is void.
 
 
 28
 Paragraph 22 quoted above is predicated upon the actual owner having an immediate right or possession and contemplates the usual situation of a fee owner holding title to a vehicle subject to a mortgage or having complete possessory rights under a conditional sale or lease with a right to purchase. The informal loose arrangement of the son reimbursing his father for the purchase price, if, as, and when he could, with the father retaining legal title and the right to use the automobile does not constitute a chattel mortgage or a conditional sale as contemplated by the statute. The father at all times retained an ultimate and immediate right of control. The transaction was informal, loose, executory, and oral and the reference to it as an executory oral agreement was a proper characterization of the same, giving the common ordinary meaning to such words and not treating them as words of art. Certainly there is nothing wrong in a parent purchasing a car for the use of his progeny. There is likewise nothing illegal about the child reimbursing the parent for the purchase with an eye to future ownership. The trial court held this to be an executory oral agreement, with legal title and actual ownership remaining in the father. We find no fault with this holding.
 
 
 29
 Furthermore, it appears that the insurance company was at least partially aware of the situation. The insurance company knew by the application that the son was to be one of the drivers of the car and probably should have known that the car was bought for his considered use along with that of his father's, since the father had other automobiles. The insurance agent of Milbank who took the application was not called as a witness nor deposed. It is possible that he had full knowledge of the facts and circumstances, and we may infer from his failure to be called as a witness that his testimony would be unfavorable to appellant. Chicago, M., St. P. and P.R. Co. v. Slowik, 184 F.2d 920 (8 Cir. 1950); Wigmore on Evidence, 2 Vol. 2 Ed. 285.
 
 
 30
 Appellant places a good deal of emphasis on the cases of Bettinger v. Northwestern Nat. Cas., 213 F.2d 200 (8 Cir. 1954); and Allstate Insurance Co. v. McKenzie, 246 F.2d 151 (5 Cir. 1957). These cases validly represent the point that an unnoted transfer of the insured vehicle relieves the insurer of the duty to respond. These cases are predicated upon the point that a transfer has taken place. In the case at bar there has been no transfer, so they fail to add any authoritative weight to appellant's argument.
 
 
 31
 In connection with a misrepresentation issue, we must consider the burden of proof question. The case of Brown v. Inter-State Bus. Mens Acc. Ass'n, 57 N.D. 941, 224 N.W. 894 (1929) has been cited by appellant as authority for its position that the burden of proof rests on the assured. Appellees have countered by referring to two later cases which took the opposite position. Equitable Life Assur. Soc. of United States v. Boisvert, 66 N.D. 6, 262 N.W. 188 (1935); New York Life Ins. Co. v. Hansen,71 N.D. 383, 2 N.W.2d 163 (1941). The conflicting positions taken by these cases is resolved by the latter cases. The burden of proving materiality or intent to deceive contained in a misrepresentation made by an insured in his insurance application rests on the insurer.
 
 
 32
 The trial court's finding that Bernhard was, in fact, the owner has adequate support in the record.
 
 
 33
 In concluding discussion on this issue the Court makes this final observation. Most automobile insurance policies are purchased informally or by 'phone with a request that a certain car be covered by insurance. Routine questions are asked, the significance of which often the uninformed and unrepresented purchaser knows nothing, depending to a large extent on the insurance agent to advise him of the conditions and pitfalls involved. The law, therefore, properly places the burden on the insurance company to prove the fraud or material misrepresentation. Absent a showing of such fraud the insurance company should furnish to the insured and to the public the apparent protection afforded by the policy.
 
 
 34
 Paragraph 5 of the Conditions of the policy provides:
 
 
 35
 'Assistance and Cooperation of the Insured-- * * * the insured shall cooperate with the company and, upon the company's request, attend hearings and trials and assist in making settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of any legal proceedings in connection with the subject matter of this insurance. The insured shall not, except at his own cost * * * assume any obligation * * *'
 
 
 36
 Milbank contends this condition was violated by Mr. Breidenbach, personal counsel for Eugene Gefroh and the administratrix of Bernhard Gefroh's estate, recommending that it settle all claims for $20,000, the maximum policy limits. Mr. Breidenbach's letter is quoted to a certain extent in the factual summary and will not be repeated at length, but it states that: 'the facts are very grim indeed from the standpoint of the defense * * * there is practically no possibility of successfully defending these claims if the matter is tried * * * Plaintiffs will recover verdicts greatly in excess of policy limits * * * possibly verdicts in excess of $100,000 * * * the defense was extremely limited' and on the basis of such reasonings or evaluations requested the insurance company to accept the offer of compromise of $20,000 for all claims previously made. The letter continued that if the offer of compromise was refused, he demanded on behalf of Eugene Gefroh and the estate of Bernhard Gefroh, full control over the defense of this matter. Copies of this letter were sent to the respective counsel for the litigating parties. Milbank viewed this as conceding liability and the revealing of policy limits as lack of cooperation.
 
 
 37
 This contention must be viewed in the light of the circumstances existing at the time the letter was written. Milbank was duly notified of the accident, statements concerning the same were freely given by Eugene Gefroh, the driver, under date of December 11, 1959 and September 22, 1960, and by his mother Barbara Gefroh, administratrix, under date of about September 22, 1960. Eugene's deposition was taken December 12, 1960, almost 18 months after the accident, after which 'reservation of rights notice' was sent to Barbara Gefroh, administratrix stating inter alia:
 
 
 38
 'Under the circumstances this letter will constitute the formal notice to you that in undertaking to defend the litigation growing out of the accident, investigating the same, adjusting or attempting to adjust the claims of the parties, we are not waiving any of our rights to deny liability under the policy because of the breach of any of its provisions, terms or conditions and especially the one with respect to ownership of the automobile.'
 
 
 39
 After receiving this letter, Barbara and Eugene employed Mr. Breidenbach. Milbank, after handling the matter and controlling the same from shortly after the accident, July 21, 1959, until December 22, 1960, abruptly laid the whole litigation with its attendant worry and expense in the lap of the insured. There was no withholding of information by the insured nor by Eugene, the covered omnibus driver. No serious attempt was made by Milbank to settle or adjust the matter nor even obtain an early court decision on the belatedly raised coverage question. Appellant had a contractual obligation to defend and pay any judgment or any settlement made by it within policy limits. At this stage the interest of the insurance company (Milbank) was in conflict with its policy holder. Later the case was on the trial docket, set for June 7, 1961. Mr. Breidenbach, the personal attorney of the insured, waited until the last few days preparatory to trial to write the letter to which Milbank takes exception. The letter contained no admissible evidence nor disclosed information which under the circumstances was necessarily prejudicial to appellant. This course of conduct does not amount to a lack of co-operation by insured but only constitutes protective measures necessary to meet the increasingly acute risks involved.
 
 
 40
 The cases cited by Milbank of Buckner v. Buckner, 207 Wis. 303, 241 N.W. 342 (1932) and Coleman v. New Amsterdam Casualty Company, 247 N.Y. 271, 160 N.E. 367, 72 A.L.R. 1443 (N.Y.1928), correctly state the law that a substantial lack of co-operation is a defense to an insurance company's liability. The lack of co-operation found in these two cases is much greater than the alleged non-co-operation here. Buckner involved a suit between brothers with the insured making conflicting statements, traveling to a neighboring state so as to be served there with process; and allowance of a default judgment in that state, which eventually served as a basis for the Wisconsin judgment to which the insurance company was asked to respond. The Coleman case involved a situation in which the insured would not answer any questions which might be of value to the defense of the case, made unjustifiable demands on insurer, and refused to sign a responsive pleading.
 
 
 41
 The above cases are sound in their legal concepts and correct in their application to factual situation involved, but cannot be the basis for avoiding liability in the present case. The trial judge in his Memorandum Opinion (not reported) properly held on this issue 'in view of the circumstances surrounding the course of action taken by Eugene and Barbara (administratrix), through their personal attorney, Mr. Breidenbach, this Court cannot say that the co-operation clause of the policy was violated, either in letter or spirit.'
 
 
 42
 The last major issue raised by appellant is the application of Paragraph 6 of the policy conditions which states as a condition precedent to liability that:
 
 
 43
 'No action shall lie against the company unless * * * the insured shall have fully complied with all of the terms of this policy nor until the amount of the insured obligation to pay shall have been * * * finally determined either by judgment against the insured after actual trial or by written agreement of the insured, claimant and the company.'
 
 
 44
 The question is whether this condition is waived by the position taken by Milbank, or if not waived, was it satisfied by the trial proceedings conducted in the state court. The decision of the trial court was based narrowly on the doctrine of equitable estoppel holding that the insurer's conduct as disclosed by the record was such as to preclude Milbank from asserting as a defense the so-called 'after actual trial' clause. And, further, that the proceedings in the state court involving the stipulation for judgment and actual entering of judgment 'could, in the opinion of this Court, be considered an 'actual trial'.' For our purposes, it is not necessary to consider whether the proceedings had in the state trial court satisfied the requirements of Paragraph 6.
 
 
 45
 The trial court was correct in its decision denying Milbank the benefit of the 'after trial' clause on the basis of equitable estoppel. However, even though closely related, we believe that the decision could have been more solidly based on the doctrine of waiver.
 
 
 46
 It is our opinion that if a liability insurance carrier unjustifiably refuses to take up the defense of a suit against its insured or makes an unwarranted withdrawal from the defense of the suit, the insured may proceed alone and make any good faith settlement of the claims against him. The insurance company may not at this point interpose a policy requirement of 'after actual trial' to defeat recovery against it. This provision of the policy was waived by the insurer when it needlessly abandoned the insured. The rule is clearly illustrated in the language of Nixon v. Liberty Mutual Insurance Co., 255 N.C. 106, 120 S.E.2d 430, 433 (1961):
 
 
 47
 'The courts generally hold that where a liability insurer denies liability for a claim asserted against the insured and unjustifiably refuses to defend an action therefor, the insured is released from a provision of the policy against settlement of claims without the insurer's consent, and from a provision making the liability of the insurer dependent on the obtaining of a judgment against the insured; and that under such circumstances, the insured may make a reasonable compromise or settlement in good faith without losing his right to recover under the policy. Annotations 142 A.L.R. 812 and 49 A.L.R.2d 744. * * *'
 
 
 48
 This 'after trial' contention also was raised by the insurance company in Kelso v. Kelso, 306 S.W.2d 534, 540 (Mo.1957). The court there said:
 
 
 49
 '(The) garnishee's conduct in wrongfully refusing to defend the suit or to assume any liability for a judgment that might be obtained therein * * * amounted to a waiver of the so-called 'after trial' clause. 'Undoubtedly the insured may waive the condition requiring a trial of the issue, and the authorities are practically unanimous in holding that a denial of liability and refusal to take the defense is a waiver of this condition.' Butler Bros. v. American Fidelity Co., 120 Minn. 157, 139 N.W. 355, 358 (44 L.R.A.N.S., 609).'
 
 
 50
 The facts in this case support a conclusion that insureds were unjustly deserted by appellant. Insureds were faced with claims exceeding $340,000 while being covered by a policy with a mere $20,000 limit. There is little doubt on the issue of negligence, and there is evidence that would support a finding of gross negligence. At the same time, the insureds had been informed that appellant was reserving its rights to deny coverage of the policy. After more than 17 months of preparation, insureds were presented with a settlement which, if accepted, would remove the spectre of financial ruin. With the trial scheduled to take place in a few days, the steps taken by insureds' counsel were reasonable and warranted under the circumstances, and were necessary to properly protect the insureds' interest. The letter in question, written by insureds' personal counsel, requested a settlement or control over the defense. This was not an unreasonable request. There was no demand for Milbank's withdrawal. This they did of their own volition. Therefore, we hold that appellant's withdrawal two days before the scheduled trial was both unwarranted and unreasonable. Being relieved of the condition of the 'after trial' clause due to Milbank's withdrawal, the insured may proceed to make a reasonable settlement.
 
 
 51
 Standing alone the insureds were placed in the unenviable position of having to choose between two equally foreboding alternatives. They could choose to face an extremely serious trial in which the possibility of a substantial judgment far in excess of the policy limits was imminent. Or they could settle the suit without trial for the $20,000 policy limits and then face the insurance company who would be seeking refuge behind the 'after trial' condition and other asserted defenses. Under the circumstances we cannot say that the choice was not proper or that the settlement effected was unreasonable. Appellant is liable under the policy.
 
 
 52
 The issues considered by the Court thus far in the opinion are dispositive of the appeal. However, mention should be made of the contention of cross-claimant Wentz that Milbank should be estopped from denying coverage. Milbank by its conduct in continuing to handle the case and assume the representation of insured for a period of over 17 months (and over four months after having raised and investigated the ownership question) might well be estopped from denying coverage. Especially is this true when the insurer makes no effort during these months to seek a determination of the ownership issue. However, the decision of the trial court was not specifically based on this doctrine, and there is no necessity for us to take a final position on this issue.
 
 
 53
 Appellee Wentz further pointed out that the filing of SR-21 form by Milbank, stating in effect that it had issued a liability policy on the car in question, estopped Milbank from denying coverage. It appears to the Court from the cases cited that the matter of conclusiveness of an SR-21 form or its equivalent, since it affects the rights of third parties, together with public welfare considerations of highway safety, presents a matter of public policy for each state. There are no North Dakota cases on this point. Since it was not part of the decision below and is not necessary to a decision in this case, it will be left open to consideration by the state courts.
 
 
 54
 The trial judge gave full consideration to the various viewpoints of all the litigating parties. His findings of fact must be approved by this Court as none of them can be set aside under Rule 52, Fed.R.Civ.P., since the same are not 'clearly erroneous.' In viewing 'the evidence in the light most favorable' to plaintiffs (Skelly Oil Co. v. Holloway, 171 F.2d 670, 674 (8 Cir. 1948), together with the application of proper legal principles applied by the District Court, we hold that the judgment of the District Court should be affirmed.
 
 
 55
 Judgment affirmed.