GLOVER LIVESTOCK COMMISSION
COMPANY, Inc., Petitioner,

v.

Clifford M. HARDIN, Secretary of Agriculture, and The United States of
America, Respondents.

No. 71–1092.

United States Court of Appeals,
Eighth Circuit.

Jan. 26, 1972.

· Edward I. Staten, Reinberger, Eilbott, Smith & Staten, Pine Bluff, Ark., for petitioner.

Raymond W. Fullerton, Elliott Metcalfe, Jr., Attys., Department of Agriculture, Washington, D. C., L. Patrick Gray, III, Asst. Atty. Gen., Kathryn H. Baldwin, Atty., Department of Justice, Washington, D. C., R. Stanley Harsh, Asst. General Counsel, for respondents.

Before LAY, HEANEY and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

Glover Livestock Commission Company, Inc. (Glover) petitions this Court for review of a decision and order of the Judicial Officer of the United States Department of Agriculture. The Judicial Officer held that Glover violated 7 U.S.C. §§ 208 and 213 of The Packers and Stockyards Act,[1] and ordered it to cease and desist from:

(1) Weighing livestock at other than their true and correct weights;

(2) Issuing scale tickets or accountings on the basis of false and incorrect weights;

(3) Paying the consignors of livestock on the basis of weights other than the true and correct weights; and

(4) Failing to operate livestock scales owned or controlled by respondent in accordance with the regulations under the act constituting INSTRUCTIONS FOR WEIGHING LIVESTOCK.

The Judicial Officer also suspended Glover as a registrant under the act for 20 days.

■ The scope of our review is limited to the correction of errors of law and to an examination of the sufficiency of the evidence supporting the factual conclusions. The findings and order of the Judicial Officer must be sustained if not contrary to law and if supported by substantial evidence. Also, this Court may not substitute its judgment for that of the Judicial Officer's as to which of the various inferences may be drawn

1. 7 U.S.C. § 208. Unreasonable or discriminatory practices generally.

(a) It shall be the duty of every stockyard owner and market agency to establish, observe, and enforce just, reasonable, and nondiscriminatory regulations and practices in respect to the furnishing of stockyard services, and every unjust, unreasonable, or discriminatory regulation or practice is prohibited and declared to be unlawful.

(b) It shall be the responsibility and right of every stockyard owner to manage and regulate his stockyard in a just, reasonable, and nondiscriminatory manner, to prescribe rules and regulations and to require those persons engaging in or attempting to engage in the purchase, sale, or solicitation of livestock at such stockyard to conduct their operations in a manner which will foster, preserve, or insure an efficient, competitive public market. Such rules and regulations shall not prevent a registered market agency or dealer from rendering service on other markets or in occasional and incidental off-market transactions.

7 U.S.C. § 213. Prevention of unfair, discriminatory, or deceptive practices

(a) It shall be unlawful for any stockyard owner, market agency, or dealer to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in connection with determining whether persons should be authorized to operate at the stockyards, or with receiving, marketing, buying, or selling on a commission basis or otherwise, feeding, watering, holding, delivery, shipment, weighing, or handling, in commerce, of livestock.

from the evidence. Fairbank v. Hardin, 429 F.2d 264 (CA 9 1970); Swift & Co. v. United States, 393 F.2d 247 (CA 7 1968) and Capitol Packing Co. v. United States, 350 F.2d 67 (CA 10 1965). Further, the Packers and Stockyards Act is remedial legislation and must be liberally construed in order to further its life and fully effectuate its public purpose to prevent economic harm to producers and consumers at the expense of middlemen. Bruhn's Freezer Meats of Chicago, Inc. v. USDA, 438 F.2d 1332 (CA 8 1971) and Swift & Co. v. United States, supra, 393 F.2d at 253.

Glover is an operator of a "posted stockyard" in Pine Bluff, Arkansas and is registered under the Act to sell livestock on commission as a registered market agency. On or about June 2, 1964, July 26, 1966 and June 20, 1967, representatives of the USDA conducted investigations of Glover's operations under the act. On each date, the representatives reweighed several drafts of consigned livestock that Glover had weighed for sale on a weight basis at the stockyard. The reweighing apparently disclosed that the drafts had been weighed at less than their true and correct weights. On August 4, 1966 and again on June 26, 1967, Glover was notified of the check-weighing results and was requested to institute corrective action which would assure accurate weighing at the stockyard.

Glover held a livestock auction at its stockyard from 1:30–4:30 p. m. on February 25, 1969. In attendance were two USDA representatives; one a livestock marketing specialist and the other a scales and weighing technician. Following completion of the sale, they selected 29 head of cattle for reweighing in 28 drafts.[2] Reweighed on Glover's scales, nine of the cattle had gained a total of 75 pounds, ten weighed the same as that shown on the weighmaster's

scale tickets and nine had lost weight.[3]

As a result of this investigation, on May 12, 1969, the Administrator of the Packers and Stockyards Administration instituted these proceedings before the Secretary of Agriculture charging violations of 7 U.S.C. §§ 208, 213(a) and 221, and 9 CFR §§ 201.43(a), 201.55 and 201.71 (1971).

SUFFICIENCY OF THE EVIDENCE

Glover contends that the Judicial Officer's finding that Glover weighed livestock at less than their true and accurate weights is not supported by substantial evidence.

Roy Glover, president of petitioner, testified with support from others that the cattle reweighed could have gone through the auction ring at any time from 1:30 to 4:30 p. m. on February 25, 1969; that it is normal procedure to stop the auction periodically and move cattle from one pen to another; and that some of Glover's pens contained food and water while others did not. Glover contends that this evidence "preponderates towards the finding" that the cattle that gained weight had been given food and water sometime during the three-hour auction, and that this explanation is more feasible than the Department's argument that the cattle were deliberately or carelessly short-weighed.

The Department's evidence was that immediately following the auction the two specialists introduced themselves and announced the purpose of their visit. Endeavoring to select cattle which had been yarded only in dry pens, Baird, a scales and weight technician who has conducted almost 350 check-weighing investigations such as this, was informed by Roy Glover that the cattle to be reweighed were presently penned where they were sold. Baird checked each of the pens from which the cattle were to

2. Apparently one cow and her calf were weighed together in one "draft."

3. The Judicial Officer noted in his findings of fact that when livestock are reweighed after an interval of time in which no food or water is available, they can be expected to show a weight loss.

be taken and, discovering no food or water present, proceeded to reweigh the 28 drafts.[4]

■ Given that cattle will tend to lose weight when they are penned without access to food and water, and assuming that the scales utilized for the weighing and reweighing are accurate (as will be discussed below), the evidence as presented would obviously allow for either of two conclusions. Either the cattle tested that had gained weight actually had access to food and water subsequent to their weighing and prior to their reweighing or they were weighed at less than their true and accurate weight. As already mentioned, this Court will not substitute its judgment for that of the fact finder where the facts will support various but opposing inferences. The Hearing Examiner and not this Court, had the opportunity to observe the demeanor of the witnesses. The cattle tested were initially weighed at most less than two hours before the reweighing began, a fact which limits the amount of time the cattle could possibly have had access to food and water. Additionally, we note that while discussing the weight discrepancies upon completion of the reweighing with Baird, neither Glover nor his weighmaster, Leonard, offered any explanation or information. We further note that Leonard, the one person in a position to contradict the Department's evidence, was not called by Glover to testify. See Adamson v. California, 332 U.S. 46, 60–61, 67 S.Ct. 1672, 91 L.Ed. 1903 (concurring opinion of J. Frankfurter 1947); Milbank Mut. Ins. Co. v. Wentz, 352 F.2d 592, 597 (CA 8 1965) and Illinois Central R. R. Co. v. Staples, 272 F.2d 829, 834 (CA 8 1959). All evidence considered, the Hearing Examiner, crediting the evidence to the effect that the cattle reweighed had had no access to food and water, could properly conclude that they had been under-weighed by Glover. Such a finding would be neither "hopelessly incredible or flatly contradict either a 'law of nature' or undisputed documentary evidence." Fairbank v. Hardin, *supra*, 429 F.2d at 268.

Glover also contends that the weight discrepancies were caused by a malfunctioning of the scales utilized at the stockyards. Glover, who leases the stockyard facilities including the scales from an unrelated corporation, claims that contrary to the Department's evidence showing the scales were accurate, it was conclusively established they were not.

On June 6, 1969, almost three and one-half months after the investigation, it accidentally learned the scales might be inaccurate. On June 9, a private scales firm authorized by the USDA to conduct livestock scale tests, determined that the scales would print one or two graduations off if the ticket printing handle was slammed too hard. As a result of this report Glover caused the lessor of the stockyards to install a new scale in October. Fred G. Wagner, a field sales engineer for the firm installing the new scales, was asked by Glover to inspect the old one being replaced. Wagner testified that several internal components were worn and rusted, a result of a lack of maintenance which should have occurred over a period of time. His conclusion was that as a result of these defects, cattle running on and off the scale could cause such a thrust or shock that the scale would measure inaccurately; that at times the thrust of cattle running onto the scale could be exactly counterbalanced by the thrust of cattle departing, causing the scale to be properly balanced when not in use, and that at times the scale would also measure accurately. Wagner also testified that the scale testing procedure normally followed, placing weights upon the corners of the scale platform, would

---

4. Although the USDA scales and weighing technician endeavored to reweigh cattle only from "dry pens," he inadvertently reweighed five who were taken from a pen in which water was available. The five head, however, showed a total weight *loss* of 20 pounds on reweighing.

not necessarily have detected the distortions he described.

Between May 27, 1964 and February 25, 1969, some 13 scale tests were conducted and each time Glover's scales were deemed accurate and capable of correctly weighing livestock. Twice during this period Glover was notified by the USDA that investigation disclosed they had been short-weighing cattle and was requested to take immediate corrective action. The record discloses Glover did not question the accuracy of the scale until these proceedings were instituted. Furthermore, the report Glover cites dated June 16, 1969, also concluded that the scale would "operate properly if not abused in stamping the ticket." Indeed, Wagner, whose expertise admittedly did not include scale testing and was in fact not testing Glover's scale for accuracy on the day he inspected it, acknowledged that livestock scales with a comparable degree of wear are capable of weighing accurately.

The USDA scales and weighing specialist, Baird, testified that immediately prior to the reweighing he inspected the scale and ascertained that the deck was moving freely and not wedged in any rigid position. During the weighing process he intermittently checked to see that the scale held its proper balance. Six days later Baird returned with an officer of the Arkansas Plant Board and conducted a physical examination of the deck and scale pit, a balance test and a distributed load test, concluding that the scale was performing properly.

■■ Clearly, there was substantial evidence supporting the Judicial Officer's finding that Glover's scale was an accurate weighing instrument. We also conclude that there was substantial evidence supporting the Judicial Officer's findings that Glover violated the Act by short-weighing cattle. Glover, when it accepts cattle for sale on consignment, must operate its business as a fiduciary [5] and the Act clearly placed upon it a duty to safeguard farmers and ranchers against receiving less than the true market value of their livestock. Bruhn's Freezer Meats of Chicago, Inc. v. USDA, *supra*, 438 F.2d at 1337. Having failed in its duty, the order to Glover to cease and desist from such practices was clearly appropriate.

## SUSPENSION OF REGISTRATION

In addition to the cease and desist order, the Judicial Officer also suspended Glover as a registrant under the Act for 20 days although staying his order pending the outcome of this appeal. He stated,

It is not a pleasant task to impose sanctions but in view of the previous warnings given respondent we conclude that we should not only issue a cease and desist order but also a suspension of respondent as a registrant under the act but for a lesser period than recommended by complainant and the hearing examiner. (The Hearing Examiner recommended a 30-day suspension.)

Glover strongly resists the suspension upon two grounds: that the suspension was in excess of the Department's statutory authority; and that the sanction imposed bears no reasonable relationship to the violation alleged and constitutes an arbitrary and discriminatory administration of the Act.

The suspension was within the Secretary's authority. 7 U.S.C. § 204 provides for the suspension of any registrant found in violation of the Act. The

---

5. United States v. Donahue Bros., Inc., 59 F.2d 1019 (CA8 1932) and Midwest Farmers, Inc. v. United States, 64 F. Supp. 91 (D.Minn., three-judge court 1945). The weight imprinted upon the scale ticket by the market agency's weighmaster determines the amount paid by the buyer. In this light, Glover occupies a unique position of trust with respect to both the buyer and seller of livestock. Its sole objective should be to obtain the highest price obtainable under open and competitive market conditions.

Administrative Procedure Act, however, provides that:

5 U.S.C. § 558 Imposition of sanctions; determination of applications for licenses; suspension, revocation, and expiration of licenses

(a) * * *

(b) * * *

(c) * * * Except in cases of wilfulness . . ., the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefore, the licensee has been given—

(1) notice by the agency in writing of the facts or conduct which may warrant the action; and

(2) opportunity to demonstrate or achieve compliance with all lawful requirements.

\* \* \* \* \* \*

Although gross neglect or acts done with careless disregard of statutory requirements may constitute a *willful* violation of the Act, see Capitol Packing Company v. United States, 350 F.2d 67, 78–79 (CA 10 1965), Goodman v. Benson, 286 F.2d 896, 900 (CA 7 1961) and Eastern Produce Co. v. Benson, 278 F.2d 606, 609 (CA 3 1960), we believe such a finding unnecessary here. Glover was given notice of its short-weighing violations in 1966 and again in 1967. Each time it was requested to comply with the Act. Glover clearly had notice of its violations and opportunity to cease such activities. See H. P. Lambert Co. v. Secretary of Treasury, 354 F.2d 819, 821 (CA 1 1965).

■ Glover urges this Court to exercise its 28 U.S.C. § 2106 [6] authority to modify the order of suspension. Ordinarily it is not for the courts to modify

ancillary features of agency orders which are supported by substantial evidence. The shaping of remedies is peculiarly within the special competence of the regulatory agency vested by Congress with authority to deal with these matters, and so long as the remedy selected does not exceed the agency's statutory power to impose and it bears a reasonable relation to the practice sought to be eliminated, a reviewing court may not interfere. 28 U.S.C. § 2106 does not allow appellate courts to enter the more spacious domain of public policy which Congress has entrusted in the various regulatory agencies. See Moog Industries, Inc. v. F T C, 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958); American Power & Light Co. v. SEC, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946); Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); Eastern Produce Co. v. Benson, *supra,* 278 F.2d at 610; G. H. Miller & Co. v. United States, 260 F.2d 286 (CA 7 1958) and Midwest Farmers, Inc. v. United States, *supra,* 64 F.Supp. at 101–102.

The Department refers us to four decisions of the Secretary in which suspensions of registration are imposed for short-weighing consigned cattle. In re Townsend, 27 A.D. 68 (1968); In re Farmers Commission Co., Inc., 24 A.D. 1491 (1965); In re Wayne County Livestock Exchange, Inc., 23 A.D. 185 (1964) and In re Milton Silver, 21 A.D. 1438 (1962). In all four it was clearly established that the complained of conduct was intentional—in each the respondent had deliberately "back-balanced" or set the scale back behind zero so that it would short-weigh livestock. And it is apparent that the dominant purpose of the suspensions imposed was to punish the various respondents for their intentional and flagrant conduct.

6. 28 U.S.C. § 2106. Determination

The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

Here to say the least, the evidence indicates that Glover acted with careless disregard of the statutory requirements and thus meets the test of "wilfulness,"[7] but its conduct was not shown to be deliberate or flagrant. Although we fully appreciate the seriousness of the offenses committed by Glover, a suspension would not "achieve . . . uniformity of sanctions for similar violations" (see In re Milton Silver, *supra*, at 1452) and it appears to us to be "unwarranted and without justification in fact." American Power & Light Co., *supra*, at 112–113. The cease and desist order coupled with the damaging publicity surrounding these proceedings would certainly seem appropriate and reasonable with respect to the practice the Department seeks to eliminate. Under these circumstances a suspension would be unconscionable. We reverse as to the suspension of Glover as a registrant under the Act.

The Secretary's order is affirmed as modified.

---

7. Capitol City Packing Co., *supra*.