**WESTERN IOWA FARMS CO. et al., Petitioners,**

v.

**UNITED STATES of America; Bob Bergland, Secretary of Agriculture, Respondents.**

**Sioux City Stock Yards, Intervenor.**

**No. 79–1904.**

United States Court of Appeals, Eighth Circuit.

Submitted April 15, 1980.

Decided July 10, 1980.

Rehearing Denied Aug. 13, 1980.

Victor J. Lich, Jr., Lich, Herold & Mackiewica, Omaha, Neb., Craig A. Raby, Crary, Huff, Yates & Clem, Sioux City, Iowa, for petitioners.

Charles R. Wolle, Shull, Marshall & Marks, Sioux City, Iowa, for intervenor-respondent, Sioux City Stock Yards.

Judith Wenker, USDA–OGC, Washington, D.C., argued, on brief, Alice Daniel, Asst. Atty. Gen., William Kaplan and William G. Kanter, Attys., U.S. Dept. of Justice, Washington, D.C., and James Michael Kelly, Asst. Gen. Counsel, Raymond W. Fullerton, Director, Litigation Division, Judith A. Wenker and Thomas C. Heinz, Attys., Dept. of Agriculture, Washington, D.C., on brief, for Dept. of Agr.

Before LAY, Chief Judge, ROSS, Circuit Judge, and LARSON, District Judge.*

\* The Honorable Earl R. Larson, Senior United States District Judge for the District of Minnesota, sitting by designation.

ROSS, Circuit Judge.

Petitioners Western Iowa Farms Co., *et al.*, a group comprised of 16 of the 23 market agencies that handled livestock sales at the Sioux City Stock Yards, filed a petition for review of a decision and order of the Secretary of Agriculture with this court. The Secretary's decision dismissed the challenge brought by the 16 market agencies to a new regulation, Rule 22, promulgated by the Sioux City Stock Yards establishing minimum annual sales requirements for all market agencies doing business at this terminal facility.[1]

Petitioners sell livestock which they have solicited from their customers (farmers, livestock producers and feeders) for a commission based upon a per head rate. In connection with this service, these market agencies use the facilities of the Sioux City Stock Yards and collect from their customers a sales commission and the yardage charge made by the Sioux City Stock Yards which is the stockyards' principal source of income and is, as is the commission of the market agencies, a part of the tariff on file with the Packers and Stockyards Administration.[2]

1. Rule 22 as amended reads verbatim as follows:

In order to foster, preserve and insure an efficient competitive public market, every market agency engaged in the sale of livestock on a commission basis at the Sioux City Stock Yards shall conform to the following minimum standards:

1. Each market agency engaged in selling cattle and calves on a commission basis shall guarantee and pay to the Sioux City Stock Yards a minimum per annum yardage revenue equal to an amount computed on the basis of 25,000 cattle multiplied by the cattle yardage charge in effect during each calender year (auction ring fees shall not be considered yardage revenue).

2. Each market agency engaged in selling hogs and feeder pigs on a commission basis shall guarantee and pay to Sioux City Stock Yards a minimum per annum revenue equal to an amount computed on the basis of 55,-000 hogs multiplied by the hog yardage in effect during each calendar year.

The above minimum standards shall be effective for the calendar year 1980 and each year thereafter. Any market agency that does not comply with the minimum standards set forth in this rule shall have thirty days after the end of the year to pay any deficiency. Failure to pay shall cause its registration at the Sioux City Stock Yards to be cancelled and the privileges of the market denied.

Each new market agency that commences business at the Sioux City Stock Yards shall have completed two full calendar years of operation before the minimum standards shall apply. New market agency shall not mean purchase or merger of existing firms.

2. At the time of the events giving rise to this action, the Packers and Stockyards Act of 1921, as amended, was administered by the Packers and Stockyards Administration which was then an agency of the United States Department of Agriculture. Effective December 30, 1977, the Packers and Stockyards Administration ceased to exist as a separate agency of

Under Rule 22, market agencies pay the usual yardage fee to the stockyard during each calendar year, but at the end of the effective year those which have not handled at least 25,000 cattle and 55,000 hogs will owe an additional sum to the stockyard, so that the total annual yardage fee paid by each of them will equal yardage fees calculated on 25,000 cattle and 55,000 hogs. If any deficiency is not paid within 30 days after the end of the year, that market agency shall not be able to continue to sell that species of livestock at the Sioux City Stock Yards. Agencies may choose to merge, terminate, drop one species of livestock or pay the deficiency.

Rule 22 was accepted by the Department of Agriculture for filing as Supplement No. 3 to Tariff No. 20 on September 19, 1977, and a formal hearing was granted petitioners and held in April of 1978. The Administrative Law Judge found the imposition of

Rule 22 to be unreasonable and discriminatory in its effect. He ordered the Sioux City Stock Yards to cease and desist from its enforcement. On September 21, 1979, the Secretary of Agriculture, through a Judicial Officer, reversed the Administrative Law Judge and dismissed petitioners' complaints. Petitioners now appeal to this court on the basis that the Rule is unjust, unreasonable and discriminatory[3] and that it is not reasonably required to foster, preserve or insure an efficient, competitive public market.[4]

This court has set out the scope of review in cases such as this in the following language:

The scope of our review is limited to the correction of errors of law and to an examination of the sufficiency of the evidence supporting the factual conclusions. The findings and order of the Judicial Officer must be sustained if not contrary

---

the Department; administration of the Act is presently delegated to the Administrator of the Department's Agricultural Marketing Service. 42 Fed.Reg. 65131 -65132, Dec. 30, 1977.

3. Petitioners contend that Rule 22 is a rate or charge for the stockyard facilities and point to § 305 of the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. § 206:

All rates or charges made for any stockyard services furnished at a stockyard by a stockyard owner or market agency shall be just, reasonable, and nondiscriminatory, and any unjust, unreasonable, or discriminatory rate or charge is prohibited and declared to be unlawful * * *.

4. Section 307 of the Packers and Stockyards Act, 7 U.S.C. § 208(a) and (b), relates:

(a) It shall be the duty of every stockyard owner and market agency to establish, observe, and enforce just, reasonable, and non-discriminatory regulations and practices in respect to the furnishing of stockyard services, and every unjust, unreasonable, or discriminatory regulation or practice is prohibited and declared to be unlawful.

(b) It shall be the responsibility and right of every stockyard owner to manage and regulate his stockyard in a just, reasonable, and nondiscriminatory manner, to prescribe rules and regulations and to require those persons engaging in or attempting to engage in the purchase, sale, or solicitation of livestock at such stockyard to conduct their op-

erations in a manner which will foster, preserve, or insure an efficient, competitive public market. Such rules and regulations shall not prevent a registered market agency or dealer from rendering service on other markets or in occasional and incidental off-market transactions. (As amended July 31, 1968, Pub.L. 90 -446, § 1(d), 82 Stat. 475.)

Additionally, 9 C.F.R. § 203.8(a) and (f) of the regulations promulgated under the Packers and Stockyards Act, provides:

(a) Stockyard services furnished by stockyard owners and market agencies pursuant to a reasonable request must be reasonable and nondiscriminatory. Stockyard owners and market agencies have the statutory right and duty to establish, observe, and enforce regulations and practices, which are not unreasonable or unjustly discriminatory, with respect to the furnishing of stockyard services.

(f) Market agencies at a terminal livestock market have invested time, resources and effort in establishing their businesses at the market. As long as a terminal livestock market continues in business as a terminal market, the market agencies at the market cannot be removed arbitrarily or capriciously by the stockyard owner. There must be good and sufficient reasons for any such action. Similarly, the number of market agencies operating at the terminal market may be reduced only if such action is reasonably required to foster and insure an efficient, competitive livestock market.

to law and if supported by substantial evidence. Also, this Court may not substitute its judgment for that of the Judicial Officer's as to which of the various inferences may be drawn from the evidence.

*Lewis v. Butz*, 512 F.2d 681, 683 (8th Cir. 1975), *quoting Livestock Commission Co. v. Hardin*, 454 F.2d 109, 110–11 (8th Cir. 1972), *rev'd on other grounds*, 411 U.S. 182, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973). Using this standard, we have thoroughly reviewed the administrative record and find that the evidence relied upon by the Judicial Officer is not insubstantial nor is his order contrary to law.

Petitioners presented testimony which included predictions that Rule 22 would eliminate, by merger or termination, seven to nine of the smaller market agencies at Sioux City, and that the Rule would result in fewer solicitors and therefore a lower volume of livestock at market. The stockyards offered testimony to the effect that quota systems established in other stockyard markets were considered beneficial and that vigorous solicitation in the country was necessary to obtain livestock receipts at the market. All parties acknowledged that livestock receipts had generally been declining since 1959.

■ The Judicial Officer found that the stockyards' management intended the Rule to provide the necessary incentive to the commission firms to work harder and increase livestock receipts. Additionally, the Rule was to make the small commission firms more financially sound thereby enabling them to hire and retain qualified people to better service their shipper-customers. Referring to excerpts from the House Subcommittee hearings on the 1968 amendments [5] to the Packers and Stockyards Act, the Judicial Officer concluded that the stockyard owner had authority to institute a quota system and that the rule is reasonably designed to accomplish a legitimate purpose, regardless of whether it proves to be successful or not. We cannot say this conclusion is contrary to law.

While petitioners argue that the Rule is a rate or charge for stockyard facilities, they do not argue error for any lack of statutory rate procedures. Rather, they ask the court to review the Rule on the basis of it being unjust, unreasonable or discriminatory—standards also found in regulatory rather than rate sections of the Packers and Stockyards Act. The Judicial Officer found the imposition of Rule 22 to have been made in a responsible manner following customary management principles; that although the quotas are easier for the large firms to meet, the Rule applies to all market agencies; and that petitioners failed to offer any evidence to show that the quota figures selected are unreasonable absent their general evidence attacking any quota system. While we might reach a different conclusion from our review of the evidence, we cannot say the decision of the Judicial Officer was not based upon substantial evidence. The evidence "may be substantial even if two inconsistent conclusions might have been drawn from it." *Corona Livestock v. United States Department of Agriculture*, 607 F.2d 811, 814 (9th Cir. 1979).

■ Petitioners also argue that respondents must show substantial evidence that the Rule was reasonably required to foster, preserve or insure an efficient, competitive livestock market.[6] The Judicial Officer, however, decided that it was not necessary for respondents to show that the quota regulation is a means of requiring the commission firms to conduct their operations in this manner. However, he remarked that even if such a showing were necessary, it would not change his decision. By implication he held that petitioners failed to demonstrate that Rule 22 could not accomplish the desired result of raising the quantities of cattle and hogs processed. In so holding he placed the burden of proof on the peti-

---

**5.** See 7 U.S.C. § 208(b) as cited in n.4.· While Congressional intent can be elusive, the cited excerpts from the hearing can be said to be supportive of the stockyards' position.

**6.** See 7 U.S.C. § 208 and regulation § 203.8(f) in n.4.

tioners. Petitioners, in oral argument, agreed that they had the burden of proof as to the invalidity of the Rule, and based upon our review of the record, we cannot say that the Judicial Officer's decision was contrary to law or factually erroneous.

The decision and order of the Judicial Officer is affirmed.

LAY, Chief Judge, Dissenting.

I respectfully dissent.

This is not a typical case involving factual findings leading to an adjudicatory agency decision. The question presented for review is whether Rule 22 complies with the statutes and regulations applicable to rules adopted by stockyard owners. Although the statute does not provide a precise calculus for measuring the validity of the rule, it does set forth relevant criteria which the Secretary of Agriculture is required to use in determining whether Rule 22 is a legally permissible rule. I find the Secretary totally failed to determine whether the rule met the relevant statutory criteria.

The governing statute provides:

It shall be the responsibility and right of every stockyard owner to manage and regulate his stockyard in *a just, reasonable, and nondiscriminatory manner, to prescribe rules and regulations* and to require those persons engaging in or attempting to engage in the purchase, sale, or solicitation of livestock at such stockyard to conduct their operations in a manner *which will foster, preserve, or insure an efficient, competitive public market.* Such rules and regulations shall not prevent a registered market agency or dealer from rendering service on other markets or in occasional and incidental off-market transactions.

7 U.S.C. § 208(b) (emphasis added).

The pertinent regulations read:

(a) Stockyard services furnished by stockyard owners and market agencies pursuant to a reasonable request must be reasonable and nondiscriminatory. Stockyard owners and market agencies have the statutory right and duty to establish, observe, and enforce regulations and practices, which are not unreasonable or unjustly discriminatory, with respect to the furnishing of stockyard services.

(f) Market agencies at a terminal livestock market have invested time, resources, and effort in establishing their businesses at the market. As long as a terminal livestock market continues in business as a terminal market, the market agencies at the market cannot be removed arbitrarily or capriciously by the stockyard owner. There must be good and sufficient reasons for any such action. Similarly, the number of market agencies operating at the terminal market may be reduced only if such action is reasonably required to foster and insure an efficient, competitive livestock market.

9 C.F.R. § 203.8(a) and (f).

The Administrative Law Judge (ALJ) found Rule 22 was unreasonable, unjust, and discriminatory since, according to his analysis, the rule would *not* "foster, preserve, or insure an efficient, competitive market." His analysis is detailed and includes the following observations:

The minimum quotas established by Rule 22 when multiplied by the number of commission firms now operating at the stockyards produces a total that is less than the projected livestock receipts of the stockyards for 1978 and less than the actual annual livestock receipts for at least the last ten years. Mr. L. V. Kuhl, General Manager of the Sioux City Stock Yard Co., testified that at the time the institution of the Rule 22 he realized that, based upon 1977 receipts, nine firms would probably not make the quota in cattle, and 9 or 10 firms would probably not meet the quota for hogs. It is quite apparent, therefore, that the real thrust of Rule 22 would directly affect 9 or 10 of the small firms presently during [sic] business at Respondent's stockyard. Rule 22 presumes that there will be no attrition in the business done by the presently large firms so they will be relatively unaffected by Rule 22. Mr. Kuhl made

no scientific projection at all on the amount of sales stimulus that would result from Rule 22. Only that some should result.

.    .    .    .    .

It is clear from Mr. Kuhl's testimony that he believes any commission firm which cannot meet the quotas under Rule 22 should not be doing business at the Stock Yard. In simple terms, the impression was conveyed that those firms which did not meet their quota would not be doing a good job either for themselves or for the support of the Sioux City Stock Yard.

.    .    .    .    .

In the instant case the evidence discloses that the Stock Yard has adequate pen capacity to do a larger overall volume of business. That it would like to have this excess capacity used to the fullest extent possible is recognized and is reasonable. However, there is no showing that the costs of providing pens and other services to the smaller commission firms which are not likely to meet their quotas is excessive, or that the small firms do not pay their fair share of these Stock Yard costs. In other words, there is no showing that the level of business generated by these small firms in any way constitutes an unreasonable or disproportionate financial burden on the Stock Yard. Indeed, the evidence discloses that these smaller firms contribute very substantially to the sales volume of the market and to the Stock Yards' well-being and profit, as well as performing a public service to sellers whom they serve.

The rationale of the Stock Yard in support of Rule 22 is that it is *hoped* that its imposition would generate more business by the smaller commission firms. There is no substantial showing that this result would reasonably be achieved. On the other hand, it was pointed out that reduction of small firms might cause some fall-off in the overall business of the Stock Yard. We consider it to be a salient fact that the imposition of the Rule would in all expectation cause the demise of many of the small firms without reasonable assurance of enhanced or even commensurate benefit to the Stock Yard.

One alternative for the firms which cannot meet the quotas is to require that their pro-rata charges would be increased above the fixed rates if they choose to continue to do business at the Stock Yard. This discriminates against them financially in favor of the larger firms meeting the quotas which would be charged only the fixed rates. While this aspect of "discrimination" is not treated in Regulation § 203.12, *supra*, it is very real and obvious.

The other alternatives available to the smaller firms not meeting their quotas is to go out of business altogether, go out of business in one specie of livestock, or to merge. In this connection we conclude that the rationale of the Secretary's decision in the *Carpenter-Walsh* decision, *supra*, is equally viable today. We conclude that the use of quotas which tend to liquidate commission firms can easily bring about a monopoly of one or two firms by successive eliminations of the first doing the least business. This in the main is unreasonable and illegal. Evidence for the use of a quota system by a stockyard must be conclusive in demonstrating the benefits of its use in each particular situation which would be substantial enough to off-set the evils inherent in the tendency towards creation of monopolies if it is to be employed. We conclude that no such evidence has been presented in the instant situation.

On consideration of all of the evidence presented we conclude that the imposition of Rule 22 by the Stock Yard is unreasonable and discriminatory in its effect. It should be vacated.

In contrast, the Secretary's analysis is astonishing. The Secretary does not attempt to analyze the unreasonableness, the unjustness or the discriminatory effect of Rule 22 in terms of the statutory mandate. The fact that the ALJ and the agency came to different conclusions is a salient factor to be considered. *Universal Camera Corp. v.*

*NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Procter & Gamble Co. v. FTC,* 358 F.2d 74 (6th Cir. 1966), *rev'd on other grounds,* 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). The Supreme Court has commented: "[E]vidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the [Secretary's] than when he has reached the same conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456 (1951). The Secretary candidly expresses complete indifference to whether or not the rule will work. He says:

> I have no concern in this proceeding with the wisdom of respondent's Rule 22, which is indeed fortunate since I have no idea whether the rule is wise or unwise. If it works—*i. e.,* if it results in stronger commission firms and greater livestock volume—it is wise; if it doesn't work—*i. e.,* if it results in the loss of personnel (who are not replaced) and less volume—it is unwise.

*Western Iowa Farms Co. v. Sioux City Stock Yards,* 38 Agric.Dec. 1296, 1317 (1979).

I seriously doubt this is the discerning analysis of a proposed rule that Congress contemplated the Secretary would make under 7 U.S.C. § 208(b).

The Secretary equates the rule with an ordinary business decision and concedes there may well be risk involved in implementing the rule as there generally is in any management decision. It would appear the Secretary assumed business judgments which contain risk and are acceptable to an ordinary business are also acceptable to the stockyard business. But few businesses are regulated to the extent of the stockyard

industry. The legislative history of the Packers and Stockyards Act, as amended, does not indicate that Congress intended to give stockyard owners free rein. Risks which accompany business decisions and are acceptable to an ordinary businessman may be unacceptable to a stockyard owner implementing a rule because the stockyard owner is subject to the statutory constraints of "just, reasonable and nondiscriminatory" in terms of whether the rule will foster and insure an efficient competitive livestock market.

The Secretary's analysis turns on whether the complainants have met their burden of proof; and whether Congress intended to give the stockyard owners free rein under the 1968 amendment.[1] The basic deficiency in the Secretary's review of the rule is the statement that:

> It is not also necessary to show that the quota regulation is a means of requiring the commission firms "to conduct their operations in a manner which will foster, preserve, or insure an efficient, competitive public market" (7 U.S.C. § 208(b); *cf.* 9 CFR 203.8(f)), *particularly since Rule 22 is not aimed at reducing the number of market agencies at Sioux City.*

*Western Iowa Farms Co. v. Sioux City Stock Yards,* 38 Agric.Dec. 1296, 1315 (1979) (emphasis added).

This statement demonstrates the Secretary's clear failure to investigate the rule as mandated by the statute.

It is not enough to casually observe that a rule appears to be reasonable, just or nondiscriminatory. A correct analysis must relate reasonableness and justness to some proper end. Here that end is statutorily prescribed: the rule must "foster, preserve or insure an efficient, competitive public market." 7 U.S.C. § 208(b). There is no

---

1. If anything, the legislative history suggests Congress intended to give the stockyard owners more power so they could deal with unscrupulous market agencies who were not acting in the best interests of the market or patrons of the market. *See, e. g.,* S.Rep.No.1331, 90th Cong., 2nd Sess. (1968), *reprinted in* [1968]

U.S.Code Cong. & Admin.News, pp. 2864, 2868. Nothing in the legislative history suggests Congress intended to extend the right to stockyard owners to impose minimum quotas which could possibly result in anticompetitive practices.

analysis as to these essential criteria in the Secretary's findings.[2]

The majority acknowledges this deficiency. However, the panel points to the Secretary's footnote comment which says:

> However, even if it were necessary to show that Rule 22 was to require the commission firms to conduct their operations in a manner which will foster, preserve, or insure an efficient, competitive public market, that would not change my decision in this proceeding. That is, I would still hold that complainants, who have the burden of proof, failed to demonstrate any deficiency in Rule 22 in this respect.

*Western Iowa Farms Co. v. Sioux City Stock Yards*, 38 Agric.Dec. 1296, 1315 n.9 (1979).

This observation focuses on the impropriety of the Secretary's review. I submit that this statement misreads the Secretary's duty under the Act and regulations. It likewise excludes any consideration of the regulations which acknowledge that market agencies cannot be removed arbitrarily or capriciously by the stockyard owner; that reduction of agencies can occur only if reasonably required to foster and insure an efficient and competitive market. *See* 9 C.F.R. § 208.8(f). The ALJ's findings, quoted *supra*, cannot be totally disregarded.

In view of the ALJ's findings, there clearly has been a prima facie showing of lessening of competition by promulgation of the rule. This alone should require the Secretary to make a proper analysis. More importantly, regardless of the burden of proof, under the statute the rule must be evaluated in terms of whether it will foster and insure an efficient and competitive market. The Secretary failed to make such a review.

I would remand for a proper analytical investigation by the Secretary to determine whether Rule 22 meets the prescribed statutory criteria.

**2.** If, as the ALJ states, the obvious effect of the rule will be to lessen the number of competitors, it is difficult to understand how this effect can be considered in the best interests of a competitive market. *See FTC v. Procter &*

Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966); *see generally* 15 U.S.C. § 18.